UNITED STATES of America, Plaintiff–Appellee,

v.

Charlton D. CLAY, Defendant–Appellant.

No. 93–2714.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1993.

Decided Feb. 15, 1994.

Counsel who presented argument on behalf of the appellant was Charles M. Shaw of Clayton, Missouri.

Counsel who presented argument on behalf of the appellee was Steven E. Holtshouser, Assistant United States Attorney, St. Louis, Missouri.

Before BOWMAN, Circuit Judge, JOHN R. GIBSON *, Senior Circuit Judge, and HANSEN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Charlton D. Clay appeals from his conviction by a jury on two counts of attempted extortion by an elected public official. 18 U.S.C. § 1951 (1988). Clay contends the district court[1] erred by: (1) admitting certain tape-recorded conversations to show Clay's participation in a conspiracy; (2) finding the

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

1. The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

government's use of a peremptory strike against a black juror was racially-neutral; and (3) enhancing Clay's sentence for obstruction of justice and for his role as an organizer, leader, manager, or supervisor in a criminal activity. We affirm.

From the spring of 1983 to the spring of 1993, Clay served as Mayor of the City of Kinloch, Missouri. The government introduced evidence showing that Clay abused his office in exchange for personal gain by engaging in a pattern of extortion, and more specifically, attempting to force recipients of government contracts to pay him kickbacks.

As evidence of one such abuse, Joseph Vitale, an owner of Vee–Jay Cement Contracting Company, told how he first contacted Clay in 1991 about the possibility of purchasing a block of land partially owned by the city. Shortly thereafter, Clay contacted Vitale and requested a "campaign contribution." Clay, however, rejected Vitale's proffered check for $1042, requesting that he be paid in cash. Vitale's complied, and gave Clay $1,000 in cash. After he was re-elected in the following election, Clay obtained passage of ordinances granting eminent domain power over the desired land to a corporation controlled by Vitale.

In 1992, Clay, acting on behalf of the City of Kinloch, contracted with Vee–Jay to clean these same lots. Although the City paid nothing for this service, the parties structured the transaction to reflect Vee–Jay as having made a $25,000 donation to the city. Vitale then selected Charles Michels of American Recycling Company to perform the actual work. Michels' only compensation was the salvage value of the materials removed, which he valued at $8,000 to $10,000. Clay's involvement in the clean-up continued, eventually giving rise to the payments charged in the two-count indictment. On March 5, Clay visited the job site and asked Michels to give him certain microwave ovens and lawn equipment from the site. Michels complied. According to Vitale, Clay met with him the following day and asked if he received any money from Michels for the clean-up work. After learning that Michels paid Vitale nothing, Clay asked Vitale to approach Michels and attempt to obtain money on Clay's behalf. Vitale and Michels testified to the ensuing negotiations between Michels and Clay, through Vitale, during which Michels learned that Clay believed he was "entitled" to $5,000. After Michels balked at the $5,000 amount, Clay visited the job site personally. According to Michels, Clay asked, "What am I making off of this? Where is my part?" Clay then agreed to accept $3,000, which he stated could be viewed as $2,500 to complete the clean-up and $500 to obtain three additional jobs in Kinloch.

The following weekend, before responding to Clay's offer, Michels contacted the FBI. Later contacts with the FBI led Michels to agree to record numerous conversations with Vitale and Clay. Thereafter, Clay frequently renewed his demands, stating for example, "give me three in cash and I'm gonna give you three lots." During this time, Michels made two payments of $1,500 each to Clay with money provided by the FBI. These payments were the subject of Counts I and II of the indictment. A jury convicted Clay on both counts. This appeal followed.

## I.

Clay argues the district court erred in admitting certain statements of Vitale and Michels in recorded and unrecorded conversations between the two under the co-conspirator exception. See Fed.R.Evid. 801(d)(2)(E). Clay first contends the district court inappropriately considered the substance of these statements in finding the existence of a conspiracy. Second, Clay argues that even if these statements were properly admitted, insufficient evidence exists linking him to the conspiracy. We address these arguments in turn.

■ Statements by a co-conspirator in furtherance of the conspiracy are admissible and not hearsay. Fed.R.Evid. 801(d)(2)(E). Before admitting statements by an alleged co-conspirator into evidence, the district court must determine by a preponderance of the evidence that the defendant knowingly participated in the conspiracy. *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir. 1978). The court may, however, conditional-

ly admit such statements subject to a later determination that the factual predicates of Rule 801(d)(2)(E) were met. *Id.; Llach v. United States,* 739 F.2d 1322, 1328–29 (8th Cir.1984). Clay argues that in making this determination the district court may not consider the substance of the statements. He directs the court to Justice Blackmun's dissenting opinion in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), which considered this use to be impermissible "bootstrapping." *Id.* at 198, 107 S.Ct. at 2790 (Blackmun, J., dissenting); *cf. Glasser v. United States,* 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942) (Court's first discussion of "bootstrapping" rule). Six justices, however, joined in the Court's holding "that a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Bourjaily,* 483 U.S. at 181, 107 S.Ct. at 2781. Clay's argument thus fails.

■ Clay contends that even if the district court could consider the substance of his alleged co-conspirators' statements, these statements cannot provide the sole basis for the court's finding of a conspiracy. *See United States v. Silverman,* 861 F.2d 571, 578 (9th Cir.1988). We need not consider this argument, because the record contains additional evidence not admitted under the co-conspirator exception that indicates the existence of a conspiracy. Michels testified about incriminating statements and actions by Clay. Vitale corroborated this testimony and provided further evidence about Clay's statements to him, including Clay's request that Vitale attempt to obtain money from Michels. These admissions by Clay were admissible regardless of the existence of a conspiracy. *See* Fed.R.Evid. 801(d)(2)(A). Thus, they provided precisely the sort of

independent evidence contemplated by the *Silverman. See* 861 F.2d at 578. Accordingly, we conclude the district court did not err in finding a conspiracy existed and admitting the contested statements under the co-conspirator exception.[2]

## II.

■ Clay next argues that the government improperly used its peremptory challenges to strike Juror Number 14, a black woman. The government may not strike prospective jurors because of their race. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986); *United States v. Thomas,* 914 F.2d 139, 142 (8th Cir.1990). If a defendant makes a prima facia case that the government used its peremptory challenges with a discriminatory purpose, the burden of providing a race-neutral explanation shifts to the government. *Thomas,* 914 F.2d at 142. We will reverse a district court's finding that the government exercised its peremptory challenge in a non-discriminatory manner only if it is clearly erroneous. *Id.; United States v. Ogbeifun,* 949 F.2d 1013, 1013 (8th Cir.1991).

■ The government used six peremptory challenges. Three of these were directed against black venirepersons, leaving only one black juror. The sole strike contested on appeal involves Juror Number 14, who testified during voir dire that she worked for an accounts payable department of a firm that purchased goods and services from Vee–Jay. She also indicated that she lived in Berkeley, Missouri, a town bordering Kinloch. Upon appellant's objection, the district court requested the government to explain why it struck the three black venirepersons.[3] The government offered two reasons for striking Juror Number 14: (1) her contacts with Vee–

---

**2.** Clay argues that because the only conspiracy involved Clay and Vitale, Michels, the victim, could not be considered a co-conspirator. The government confirms that the claimed conspiracy was between Clay and Vitale and, therefore, Michels' status is irrelevant. In any event, statements of a victim may be admitted under the co-conspirator exception. *United States v. Kendall,* 665 F.2d 126, 131–33 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). Further, in light of the direct testimony

by Michels and Vitale concerning the statements made by Clay, the contested testimony was cumulative, and any error in admitting it was harmless beyond a reasonable doubt. *See United States v. White,* 11 F.3d 1446, 1450–51 (8th Cir. 1993).

**3.** We assume without deciding that the district court properly shifted the burden of showing a race-neutral explanation to the government.

Jay and its officers, and (2) her residence in Berkeley. The district court accepted these as racially-neutral reasons.

The court's decision is not clearly erroneous. Joseph Vitale and Vee–Jay played critical roles in this case. Moreover, the defense attacked Vee–Jay's bookkeeping with regard to the "campaign contribution" to Clay. The government could reasonably decide to strike Juror Number 14 because of her earlier contact with Vee–Jay. Similarly, the fact that Juror Number 14 resided in Berkeley suggests a possible familiarity with the continuing conflict between the St. Louis airport and the cities in the area (including Kinloch)—a topic of much testimony during trial.[4]

## III.

Clay's final arguments attack the district court's enhancement of Clay's sentence for obstruction of justice and for his role as an organizer, leader, manager, or supervisor in a criminal activity.

■ The district court imposed the two-level obstruction of justice enhancement after finding that Clay perjured himself during the trial. *See* United States Sentencing Commission, *Guidelines Manual*, § 3C1.1, cmt. (n. 3(b)) (Nov. 1993). Clay contends that section 3C1.1, when applied to perjured testimony during trial, impermissibly burdens his right to testify, and is therefore unconstitutional. The Supreme Court has held to the contrary in *United States v. Dunnigan*, —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). *See also Ogbeifun*, 949 F.2d at 1014. *Dunnigan* holds that an enhancement for perjury during the course of trial "is not in contravention of the privilege of an accused to testify in [his] own behalf." —— U.S. at ——, 113 S.Ct. at 1119.

■ Clay also contends that insufficient evidence supported the court's perjury finding. We reverse a district court's factual finding in support of a section 3C1.1 enhancement only if it is clearly erroneous. *United States v. Mills*, 987 F.2d 1311, 1317 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 403, 126 L.Ed.2d 351 (1993). The district

court found as perjured testimony Clay's statements that Michels first approached him and offered money for the purpose of helping the city's residents, and that Clay distributed the $3,000 to others for purposes of guarding the clean-up site. The government's witnesses and the tape-recorded conversations provide substantial evidence supporting the court's finding that these statements were false, and thus perjury. Moreover, Clay's own trial testimony supports the court's finding. For example, Clay was unable to name any of the several persons to whom he allegedly distributed the $3,000. We reject Clay's argument.

■ The court also imposed a two-level enhancement for Clay's role as an organizer, leader, manager, or supervisor in a criminal activity. *See* U.S.S.G. § 3B1.1. The district court found that Clay "organized" the criminal activity of extortion, and "recruited" Vitale to assist him. Clay contends that insufficient evidence supported this finding. We review this finding under the clearly erroneous standard. *United States v. Horne*, 4 F.3d 579, 590 (8th Cir.1993). Clay argues that the only evidence supporting this finding comes from Vitale's trial testimony, which Clay claims is inherently unreliable. We reject this argument. The taped conversations show Clay demanding money from Michels. Michels testified that Vitale demanded money for Clay. Viewing this evidence in the light most favorable to the government, as we must, we find ample support for the district court's enhancements.

Accordingly, we affirm.

---

**4.** At trial, Clay testified that Michels, Vitale, the Airport Authority, the FBI, and the grand jury conspired to block development in Kinloch because it was a black city.