# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2938

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Lauree Anne Brekke, | * | |
| | * | |
| Appellant. | * | |

_____

No. 97-2939

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| James Stanley Brekke, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 11, 1998
Filed: August 26, 1998

_____

Before BOWMAN, Chief Judge, HEANEY, and LOKEN, Circuit Judges.

_____

BOWMAN, Chief Judge.

James and Lauree Brekke, husband and wife, were charged in a seven count indictment with bank fraud in violation of 18 U.S.C. § 1344 (1994), making false statements to a financial institution in violation of 18 U.S.C. § 1014 (Supp. II 1996), mail fraud in violation of 18 U.S.C. § 1341 (1994), and conspiracy to commit bank fraud and mail fraud in violation of 18 U.S.C. § 371 (1994). The District Court dismissed the indictment, ruling that an earlier settlement in a civil action precluded criminal prosecution. We reversed and remanded for reinstatement of the indictment. See United States v. Brekke, 97 F.3d 1043, 1050 (8th Cir. 1996), cert. denied, 117 S. Ct. 1281 (1997). Upon trial, a jury convicted Lauree Brekke of bank fraud, making a false statement, and mail fraud, and convicted James Brekke of bank fraud and mail fraud.[1] Both James and Lauree were sentenced to 27 months' imprisonment. The Brekkes appeal.

The Brekkes argue that their attorney's joint representation of them at trial violated the Sixth Amendment and that the District Court erred in its application of the sentencing guidelines. We affirm.

I.

James and Lauree Brekke operated Brekke Construction, Inc., in Fargo, North Dakota. In 1989, the Brekkes sought to obtain a loan to save their troubled business. After several failed attempts at getting a loan, the Brekkes contacted DeWayne Lesmeister at Heartland Services, Inc., to assist them in finding a lender. Lesmeister contacted Rudell Oppegard, president of Twin Valley State Bank (Twin Valley) in Twin Valley, Minnesota, and negotiated a $350,000 loan for the Brekkes. In return for

---

[1]The government dismissed the false statement charge against James Brekke at the close of its case-in-chief.

his services, the Brekkes agreed to pay Lesmeister a $10,000 fee. To secure the loan, the Brekkes executed personal guaranties and granted Twin Valley mortgages on certain parcels of real estate. In addition, the Small Business Administration (SBA) agreed to guaranty 83% of the loan. In March 1990, as soon as the Brekkes received the loan proceeds, they paid the $10,000 fee to Lesmeister and used $50,000 to purchase a certificate of deposit from Twin Valley in the name of "Edith Flaa," Lauree Brekke's mother, to compensate the bank for the balance, or non-guaranteed portion, of the loan.

As part of the SBA application process, the Brekkes certified that they had pledged to Twin Valley mortgages they owned on certain properties and that no liens or encumbrances existed against those properties except those referred to and disclosed in the loan application. The Brekkes further represented that no payments of compensation in connection with the loan were made, that Twin Valley would not receive a compensating balance or certificate of deposit for the loan, and that the loan proceeds would be used exclusively for working capital. In July 1990, when the Brekkes defaulted on the loan, the SBA discovered that the properties pledged as security were subject to a number of undisclosed prior liens. As a result, none of the collateral pledged in support of the loan could be liquidated. The SBA reduced its guarantee to less than 50% and settled with Twin Valley, reserving the right to pursue claims for reimbursement against the Brekkes. In 1994, the SBA brought a civil suit against the Brekkes, alleging that the Brekkes had made false representations to the SBA and had conspired to defraud the United States. In a settlement, the Brekkes agreed to pay $130,000 in exchange for the SBA's dismissal of the civil action.

In 1995, a grand jury investigated the loan transaction and returned an indictment against the Brekkes and Rudell Oppegard.[2] The grand jury charged that the Brekkes

---

[2]Mr. Oppegard pleaded guilty to conspiracy to commit bank fraud and mail fraud. He is not a party to this appeal.

fraudulently obtained from Twin Valley, through the assistance of Oppegard, a $350,000 loan guaranteed by the SBA by misrepresenting the lien positions on their collateral; misrepresenting that the loan proceeds would be used exclusively for working capital; and misrepresenting that Twin Valley would not receive any benefit in connection with the loan.

The indictment was dismissed and subsequently reinstated. See Brekke, 97 F.3d at 1050. After the arraignment, the government moved under Federal Rule of Criminal Procedure 44(c) to inquire as to the potential conflict arising out of attorney Jonathan Garaas's joint representation of the Brekkes. The presiding magistrate judge held a hearing at which the Brekkes both were represented by separate counsel. At the hearing, the court individually questioned James and Lauree about their desire to be jointly represented by counsel. The court explained that a conflict might arise and gave several illustrative examples. The court reminded James and Lauree that they each had a right to appointed counsel if they could not afford an attorney. The court also informed them that, by waiving any potential conflict, "[Y]ou will not be heard at anytime in the future either on appeal or any post conviction remedies if you are convicted of any crime to say that you didn't get a fair trial because you had one lawyer who represented the both of you." Tr. of Criminal Mot. Proceedings at 8. Finally, the court opined:

> I will tell you that in my experience, as a general proposition, individuals who are charged with a crime by the United States and are facing prosecution by all of the powers and forces that the United States has to bring to a prosecution, that defendants are generally better served by having individual lawyers as opposed to joint representation. But, the Court recognizes that each defendant has a right to choose his or her own lawyer.

-4-

Id. at 14-15. The Brekkes then reiterated their desire to be jointly represented. The court found them to have knowingly and intelligently waived any conflict that might exist in joint representation.

On the first day of trial, before the jury was assembled, the District Court questioned the Brekkes on their continued desire to be jointly represented. Both James and Lauree asserted that they wished to proceed with joint representation and that they waived any potential conflicts. The Court reminded the Brekkes that there might be a conflict of interest and that they each had a right to appointed counsel. Finally, the court instructed the Brekkes to notify the court if a conflict developed or if they did not wish to have Mr. Garaas continue to jointly represent them during trial. The trial thus proceeded with Mr. Garaas representing the Brekkes.

The Brekkes were tried and convicted. A sentencing hearing followed, at which the court found the amount of loss for sentencing guidelines purposes to be $350,000, reasoning:

> Assuming, for the sake of argument, that there was no actual loss to the SBA, based on the evidence presented at trial the court finds that the amount of the intended loss is approximately $350,000. In addition, when the fraud was discovered by the SBA, the entire balance of the $350,000 loan was outstanding.

Sentencing Tr. at 49 & 83. The court increased both James and Lauree's sentences by adding a two-level enhancement for obstruction of justice. The court found that both had committed perjury during their testimony at trial. With respect to James Brekke, the court stated:

> Based on the great weight of evidence presented against him at trial, the court finds that the defendant knowingly and willfully lied under oath

regarding several matters that were material to the charges before the jury in an effort to substantially affect the outcome of the case.

Id. at 80. The District Court also made an identical finding with respect to Lauree's obstruction of justice. Id. at 46.

II.

James and Lauree Brekke first argue that Mr. Garaas's joint representation violated their Sixth Amendment right to effective assistance of counsel. The Brekkes assert that they did not knowingly and intelligently waive their right to conflict-free counsel and that an actual conflict of interest during trial affected Mr. Garaas's performance. We review for clear error a district court's factual findings that underlie a determination of whether a defendant waived his right to conflict-free counsel, but we review de novo the ultimate determination of whether a waiver occurred. Cf. United States v. Caldwell, 954 F.2d 496, 504 (8th Cir.), cert. denied, 506 U.S. 819 (1992).

Joint representation clouded by conflict of interests may violate the Sixth Amendment's right to effective assistance of counsel. A defendant, however, "may waive his right to the assistance of an attorney unhindered by a conflict of interests." Holloway v. Arkansas, 435 U.S. 475, 483 n.5 (1978). The waiver must be knowing, voluntary, and intelligent. See United States v. Poston, 727 F.2d 734, 738 (8th Cir.), cert. denied, 466 U.S. 962 (1984). Specifically, the trial court must conduct a pretrial inquiry into the propriety of joint representation and advise both defendants of their right to separate representation. See Fed. R. Crim. P. 44(c). This circuit specifically requires:

> "The court should address each defendant personally and advise him of the potential danger of dual representation. The defendant should have

an opportunity and be at liberty to question the trial court on the nature and consequences of dual representation and the entire procedure should be placed on the record for review."

United States v. Lawriw, 568 F.2d 98, 104 (8th Cir. 1977) (quoting State v. Olsen, 258 N.W.2d 898, 907 (Minn. 1977) (footnote omitted)), cert. denied, 435 U.S. 969 (1978).

The Brekkes argue that the hearings conducted by the magistrate judge and the District Court failed to fulfill the requirements set forth in Lawriw. We disagree. We find that the pretrial hearing indeed satisfied the Lawriw requirements. The magistrate judge addressed James and Lauree separately, advised each of the dangers of joint representation, and afforded them ample opportunity to question the court. James and Lauree's waivers at that hearing were knowing, voluntary, and intelligent. We find unpersuasive the contention that the District Court's later colloquy with the Brekkes negated their initial waivers. Becuase they already had waived their right at the pretrial hearing, the District Court was not required to conduct a second full-blown Lawriw hearing. See Poston, 727 F.2d at 739 n.2. Furthermore, we find in the record no new developments at trial that would have required the District Court to conduct an additional inquiry. We conclude that James and Lauree's waivers of their right to separate representation were knowing, voluntary, and intelligent. As a result, we need not determine whether a conflict actually existed. See id. at 737-38.

The Brekkes next argue that the District Court erred in finding for purposes of sentencing under the guidelines the amount of loss. The District Court determined that the amount of loss caused by the Brekkes' fraud was $350,000, or the full amount of the loan. Based on this figure, the District Court increased their base offense by eight levels. See U.S. Sentencing Guidelines Manual § 2F1.1(b)(1)(I) (1997). We review a district court's calculation of loss under USSG § 2F1.1 for clear error. See United States v. George, 986 F.2d 1176, 1179 (8th Cir. 1993).

Section 2F1.1 provides for an increase in a defendant's offense level based on the amount of loss caused by that defendant's fraud.  See USSG § 2F1.1.  In determining the loss, the application notes provide:

> In fraudulent loan application cases . . . the loss is the actual loss to the victim . . . .  For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan.  However, where the intended loss is greater than the actual loss, the intended loss is to be used.

USSG § 2F1.1, comment. (n.7(b)).  We construe the guidelines to mean, "Where the district court finds . . . that the defendant intended to defraud the bank of the entire amount of the loans obtained by a false loan application, it remains free to use the total amount as the loss for purposes of section 2F1.1."  United States v. Willis, 997 F.2d 407, 418 (8th Cir. 1993), cert. denied, 510 U.S. 1050 (1994).  As evidence of their intent not to defraud the bank of the entire amount, the Brekkes point to the fact that they had made a couple of payments before they defaulted, that the bank still possessed subordinate liens on the properties they pledged as security, and that they repaid almost $130,000 to the SBA in accordance with the settlement.  The Brekkes therefore argue that the District Court should have calculated the amount of loss at no more than $150,000.  We disagree.

Even taking into account that the Brekkes made several payments on the loan, which payments amounted to less than $20,000,[3] the figure with which we are left is

_____

[3]In July 1990, Lauree cashed the $50,000 CD (purchased by the Brekkes with the proceeds from the SBA-guaranteed loan) and opened a personal savings account the same day.  The evidence showed that Lauree made these loan payments from the proceeds of the CD.

still well within the $200,000 to $350,000 range requiring an eight-level enhancement. See USSG § 2F1.1(b)(1)(I).  Further, we will not consider the Brekkes' repayment to the SBA in determining the amount of loss, see United States v. Prendergast, 979 F.2d 1289, 1291-92 (8th Cir. 1992), particularly in light of the fact that their repayment was in response to legal action taken by the SBA, see United States v. Mills, 987 F.2d 1311, 1316 (8th Cir.), cert. denied, 510 U.S. 953 (1993).  We also reject the claim that the amount of loss should be reduced because the bank still possessed subordinate liens on those properties pledged by the Brekkes.  When the Brekkes defaulted, the bank received nothing from the properties, on which the Brekkes had led the bank to believe it had first priority liens.  The subordinate liens thus provide no basis for reducing the amount of the loss.  Finally, it is important to note that the District Court had the benefit of observing both James and Lauree testify and was therefore in a better position than we are to determine the issue of the Brekkes' intent.  We cannot conclude that the District Court clearly erred in finding that the Brekkes intended to inflict on the bank a loss of over $200,000.

Finally, James Brekke argues that the District Court erred in increasing his base offense level by two levels for obstructing justice.[4]  Section 3C1.1 of the sentencing guidelines provides for a two-level increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."  USSG § 3C1.1 (1997). The District Court found that James knowingly and willfully lied under oath at trial about matters material to the charges against him.  "We reverse a district court's factual finding in support of a section 3C1.1 enhancement only if it is clearly erroneous." United States v. Clay, 16 F.3d 892, 896 (8th Cir. 1994) (citing Mills, 987 F.2d at 1317).

---

[4]While Lauree Brekke's base offense level also was increased by two levels for obstruction of justice, she does not appeal this issue.

We reject James's contention that there is no evidence to suggest that he committed perjury while on the stand. Much of his testimony, particularly with respect to the ownership and lien status of a certain parcel of property, directly conflicts with other evidence presented at trial. The District Court did not clearly err in finding that James committed perjury and in increasing his base offense level by two levels.

In conclusion, we affirm the judgment of the District Court.

A true copy.

   Attest:

         CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.