22CA0242 & 22CA0276 Peo v Lopez 07-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals Nos. 22CA0242 & 22CA0276
Arapahoe County District Court No. 09CR367
Honorable Ryan J. Stuart, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Daniel Jesus Lopez,

Defendant-Appellant.

---

JUDGMENT AND ORDER AFFIRMED

Division I
Opinion by JUDGE J. JONES
Yun, J., concurs
Taubman*, J., specially concurs

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

---

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Daniel Jesus Lopez, appeals the trial court's judgment of conviction entered on jury verdicts finding him guilty of first degree murder after deliberation, first degree felony murder, and first degree burglary.  He separately appeals the postconviction court's order denying his Crim. P. 35(c) motion for a new trial.  We have consolidated the two appeals, *see* C.A.R. 3(c)(2), (3), and the records are combined.  We affirm the judgment of conviction and the order.

## I.     Background

¶ 2     The victim was sexually assaulted and killed in her apartment.  An autopsy later showed that she died from three stab wounds to her chest combined with several blows to her head.  During the investigation several days later, a detective found a knife that someone had placed between cans in the victim's pantry, which the detective thought was an odd place to put a knife.  He collected the knife because he thought it might be the murder weapon.  Investigators also swabbed or took DNA samples from the victim's body, clothes, and apartment; collected condoms and condom wrappers found near the victim and in a nearby alley; and searched the apartment for fingerprints.  DNA analysts found Lopez's DNA on

1

the victim's body, clothes, and her toilet but not on the condoms or condom wrappers. Investigators determined that Lopez's handprint matched one that they had found on an armoire in the victim's apartment.

¶ 3 The People ultimately charged Lopez with first degree murder after deliberation, first degree felony murder, and first degree burglary. A jury convicted him as charged. The trial court merged the murder convictions and sentenced Lopez to life in prison without the possibility of parole for first degree murder after deliberation, to run consecutively to a thirty-two-year prison term for his burglary conviction. A division of this court affirmed the convictions on direct appeal. *People v. Lopez*, (Colo. App. No. 13CA1053, Aug. 6, 2015) (not published pursuant to C.A.R. 35(f)).

¶ 4 Lopez filed a Crim. P. 35(c) motion for postconviction relief. The postconviction court forwarded the motion to the public defender's office, and the public defender filed a supplemental motion on Lopez's behalf. As relevant to these appeals, the supplemental motion asserted that Lopez had been denied his right to effective assistance of counsel because the attorneys who had represented him at trial and on appeal labored under a conflict of

interest — a conflict which arose when an investigator employed by the attorneys' law firm took possession of a knife from Lopez's residence and brought it back to the law firm's office, where it stayed for more than three years before the law firm turned it over to the prosecution. At trial, the prosecution theorized that this knife, too, could have been the murder weapon.

¶ 5 Following a three-day evidentiary hearing, the postconviction court partially granted and partially denied the motion. On the conflict claim, the postconviction court ruled that the attorneys had only a potential conflict, not an actual conflict, of interest at trial (or in plea negotiations) and that Lopez had validly waived that conflict (even if it was an actual conflict). But as for the law firm's representation of Lopez on direct appeal, the court found that the appellate attorney had an actual conflict that Lopez hadn't waived. Accordingly, although the court refused to set aside the judgment of conviction or require reinstatement of the plea offer Lopez had rejected, it granted Lopez a new direct appeal.

¶ 6 That appeal is before us as Case No. 22CA0276. Lopez also appeals the postconviction court's denial of his Rule 35(c) motion insofar as the court ruled that he isn't entitled to a new trial or

reinstatement of the plea offer. That appeal is before us in Case No. 22CA0242. Both appeals share the same record. And we have consolidated the appeals.

¶ 7    In both appeals, Lopez challenges the trial court's and the postconviction court's conclusions that his trial attorneys didn't have an actual conflict of interest and that he validly waived his trial attorneys' conflict. And in the direct appeal, Lopez also contends that some of the trial court's comments to prospective jurors during voir dire undermined his presumption of innocence and improperly lowered the prosecution's burden of proof.

## II.    Conflict of Interest

¶ 8    In both appeals, Lopez contends that his trial attorneys created an actual conflict of interest by collecting and retaining the knife obtained from Lopez's residence; that the conflict wasn't waivable; and that even if it was waivable, the trial court and the postconviction court erred by finding that he waived the conflict. We conclude that Lopez waived the conflict.

## A.    Procedural Considerations

¶ 9    As a preliminary matter, in his reply brief in the direct appeal, Lopez argues that we should review the conflict of interest

contention raised in his second direct appeal using only the record that was available at the time of his first direct appeal. That is, he doesn't want us to consider the record developed in the postconviction proceedings concerning the conflict because, he asserts, that is "[t]he only meaningful way to effectuate Mr. Lopez's right to a direct appeal with conflict-free counsel." We will consider the entire relevant record for the reasons we explain below.

¶ 10    Generally, a defendant can't raise a claim of ineffective assistance of counsel on direct appeal because such a claim "requires the development of a factual record that will not have been developed in the trial court." *A.R. v. D.R.*, 2020 CO 10, ¶ 62 (citing *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003)). This is because the trial record may not indicate whether counsel's actions were based on a "sound strategic motive" or "because his alternatives were even worse." *Ardolino*, 69 P.3d at 77. And ineffective assistance of counsel claims may implicate issues which can't be resolved absent an evidentiary hearing — followed by factual findings — with testimony by trial counsel, the defendant, and perhaps others. *See, e.g., People v. Blehm*, 983 P.2d 779, 791-92 (Colo. 1999) (challenges to the validity of a waiver of the right to

5

testify can only be raised in a postconviction proceeding where an adequate record can be developed). This is also true when the ineffective assistance claim is premised on an alleged conflict of trial counsel. *See People v. Lopez*, 2024 CO 50, ¶¶ 51-52 (remanding for a hearing to develop an adequate factual record on an alleged conflict of interest). And it is particularly true for claims involving the defendant's knowledge and the validity of any waiver, as resolving such issues will almost invariably require evidence that isn't in the trial court record. *See Blehm*, 983 P.2d at 785; *People v. Thomas*, 867 P.2d 880, 886 (Colo. 1994) (recognizing the advantages of requiring ineffective assistance of counsel claims to be brought, not on direct appeal, but in a Rule 35(c) motion).

¶ 11    This is such a case. Though, as discussed in more detail below, the trial court held a hearing on the conflict of interest question, neither Lopez's attorneys nor Lopez himself testified at that hearing. And the attorney appointed to investigate and advise Lopez concerning the purported conflict — Jesse Glassman — gave only a limited report; he didn't testify under oath, wasn't examined by counsel, and didn't say specifically what he had told Lopez. Given that Lopez's direct appeal challenges the trial court's finding

that he waived trial counsel's conflict, were we to consider that appeal in a vacuum, we would require Lopez to file a Rule 35(c) motion for further development of the record. What we wouldn't do is decide the issues raised on direct appeal based on a plainly insufficient record. *Cf. People v. Austin*, 2024 CO 36, ¶ 24 (concluding that the record was insufficient to determine whether the prosecution's strike of a potential juror was unconstitutional under *Batson* and remanding to the trial court for further findings).

¶ 12    But requiring the filing of another Rule 35(c) motion for further development of the record would be pointless in this case because Lopez already filed such a motion, arguing against any waiver of conflict, and the court conducted an evidentiary proceeding on it. Because we have a fully developed record on the conflict issue, we will consider the whole of that record.

¶ 13    *Downey v. People*, 25 P.3d 1200 (Colo. 2001), on which Lopez relies, doesn't require a contrary conclusion. In a footnote, the court said, "Review of a claim of ineffective assistance of trial counsel that is raised on direct appeal is limited to the existing record, whereas a claim of ineffective assistance of trial counsel raised in post-conviction proceedings may be supplemented by

evidence supporting the claim." *Id.* at 1202 n.3. But the court didn't hold that the *merits* of every claim of ineffective assistance of trial counsel raised on direct appeal can or even should be resolved on the existing record. Indeed, as the court held in *Ardolino*, ineffective assistance claims will often require further development of the record in a postconviction proceeding. 69 P.3d at 77-79. So if, as in this case, the record created before and during the trial is insufficient to resolve an ineffective assistance claim raised on direct appeal, the appellate court will deny it, subject to the defendant's right to raise it in a postconviction motion. *See People in Interest of Uwayezuk*, 2023 COA 69, ¶ 21 ("Generally in criminal cases, a claim of ineffective assistance of counsel may not be raised on direct appeal."); *cf. People v. Vondra*, 240 P.3d 493, 495 (Colo. App. 2010) (an additional postconviction proceeding wasn't necessary because the district court had already held a separate hearing on the defendant's ineffective assistance of counsel claim in the context of a Crim. P. 32(d) motion); *People v. Kelling*, 151 P.3d 650, 655 (Colo. App. 2006) (recognizing the need to develop a factual record for an ineffective assistance claim in postconviction

proceedings because a direct appeal's record is ordinarily insufficient).

¶ 14    We turn then to the merits of Lopez's conflict of interest claim.

### B.    Trial Court Proceedings

¶ 15    In 2009, after Lopez was arrested, he retained the law firm of Springer and Steinberg, P.C. (the firm), to represent him.  Attorney Harvey Steinberg supervised the defense.  Attorneys Daniel Deters, Geanne Moroye, and Richard Toray (collectively, trial counsel) worked on the case.

¶ 16    In October 2009, someone at the firm heard a recently recorded jail call in which Lopez asked his girlfriend, Jennifer Trujillo, whether the police had searched their house and told her to "throw away" anything that made him "look bad," such as "drug paraphernalia" or "Jose's knife."  Karl Scherck, the firm's investigator, went to Lopez's house in October 2009, and Lopez's father gave him the knife.  He locked the knife in the firm's safe, where it remained for over three years.  (It appears that police detectives, who also seemed to have (or had) heard about the jailhouse call, asked Trujillo about this knife before Scherck came to the house, and she told them she couldn't find a knife.  But the

9

record is a bit unclear as to the timing of the detectives' visit vis-a-vis Scherck's visit.)

¶ 17    In late 2010 or early 2011, an assistant district attorney listened to the same call and contacted Steinberg, inquiring whether the firm had "Jose's knife" and, if so, demanding that the firm turn it over to the district attorney's office because the prosecution believed the knife was incriminating.  The firm didn't respond to that request.  A month before trial, the district attorney's office contacted Steinberg again after learning from Trujillo that Scherck had taken a knife from Lopez's home in 2009.  The firm then turned the knife over to the prosecution.

¶ 18    Shortly before trial, Lopez's trial attorneys, Deters and Toray, raised a conflict of interest concern with the trial court because the firm had collected and retained "Jose's knife," and the prosecution intended to introduce that knife into evidence as a potential murder weapon.[1]  Defense counsel was concerned that, given the chain of custody of the knife, someone with the firm (apparently, Scherck,

---

[1] The prosecution's medical examiner witness didn't know what knife had caused the victim's injuries, but he indicated that either of the knives recovered by the police could have caused the injuries.

but possibly also the attorneys) could be a witness. The prosecutor confirmed that the prosecution intended to introduce the knife at trial as a potential murder weapon, said tests on the knife didn't return DNA or fingerprint results, and said the knife appeared to have been "wiped clean." The court appointed Glassman as independent, conflict-free counsel to investigate and research the conflict and advise Lopez.

¶ 19 Glassman investigated and researched the issue and advised Lopez before the court's hearing on the conflict. At the hearing, Glassman told the court that either Trujillo had asked someone at the firm to get the knife or an attorney at the firm named "Adam Tuck" had told Scherck to retrieve the knife after listening to the jailhouse call.[2] Glassman also testified that if the firm had knowingly withheld inculpatory evidence of Lopez's crime, the firm's

[2] Glassman said at the conflict hearing and testified in the postconviction hearing that Steinberg told him someone named "Adam Tuck" directed Scherck to obtain and conceal the knife. But in the postconviction hearing, Steinberg acknowledged that "Adam Tuck" was likely Adam Tucker, an attorney who had left the firm before Lopez retained it. Tucker testified in the postconviction hearing that he had left the firm in February 2009 and never worked on Lopez's case because the firm didn't begin representing Lopez until March 2009.

attorneys could be criminally liable for tampering with evidence and as accessories to a crime. He said that they might also have violated the Colorado Rules of Professional Conduct as construed in the Colorado Bar Association Ethics Committee's Formal Opinion 60. But he also said that he had spoken to the attorneys, who said they didn't know the knife was in the firm's possession until very recently and had turned it over to the prosecution as soon as they found out. Glassman opined that a potential conflict would exist if the prosecution were to assert or imply that the firm had tried to conceal the knife or had tampered with it, such as by wiping it. Glassman testified that, although the prosecutors had told him they didn't intend to assert or imply any concealment or tampering by the firm, the jury could still draw that inference from the chain of custody evidence. The prosecutors told Glassman that they did not plan to file criminal charges or ethical misconduct complaints against anyone at the firm.

¶ 20    The prosecution and Lopez's attorneys stipulated to the admission of "Jose's knife" and the chain of custody associated with it, which they hoped would avoid any inference that the firm had retained the knife and obviate the need for anyone associated with

12

the firm to testify about the chain of custody. That stipulation told the jury only that the firm's investigator had obtained the knife and that the firm subsequently turned it over to the prosecution in the same condition as when the firm obtained it. The court agreed that the stipulation resolved the potential conflict of interest.

¶ 21 The court asked Lopez, who was present at the hearing, whether he had heard and understood the conversation. Lopez responded, "Yeah. Kind of, yes," "[a] little bit, yes." When the court asked him to clarify what he meant, Lopez replied, "I don't really understand all the terminology." After confirming that Lopez had heard everything, the court explained the conflict of interest — "[T]his issue [is] about the knife, whether that would cause [your attorneys] to give you less than 100 percent because they would be worried about their impact in this case" — and asked whether he understood. Lopez replied that he did. The court also explained the stipulation to Lopez — specifically, that the jury would be told about the sequence of events but not about the timing, the call from the district attorney, or the ethical issues and that the jury would be told that "the knife was in the same condition when given to the

13

CBI as it was when Jennifer Trujillo gave it to [Scherck]." Lopez said he understood.

¶ 22   The court then asked Lopez whether, after talking to Glassman and Toray, he would be willing to "give up that objection." Lopez said, "Yes." The court asked Lopez whether he had any questions. He said he didn't. The court then advised Lopez that if any trial testimony undermined the stipulation, the court would declare a mistrial. Lopez reiterated that he wanted to keep his current counsel.

¶ 23   The court concluded that there wasn't a conflict and that, to the extent there was a potential conflict, Lopez had waived it. The firm's attorneys — Toray and Deters — continued to represent Lopez throughout the trial. (A different attorney with the firm, Michael Zwiebel, represented Lopez on direct appeal.)

¶ 24   At trial, Trujillo testified that she had never actually seen "Jose's knife" and that a detective had asked about it, but the "attorneys ha[d] already came [sic] and picked [Jose's knife] up." Lopez's counsel objected to that testimony because it violated the stipulation by indicating that defense counsel had been involved in collecting and retaining the knife. Counsel moved for a mistrial.

The court denied the motion saying, "She said she gave it to an attorney." The prosecutor then asked that the knife be admitted and the stipulation read to the jury. Without objection, the court instructed the jury as follows:

> Ladies and gentlemen, the parties have reached a stipulation that I'm going to read to you. The stipulation is factual, and you must accept it as being true without the need for any further testimony about it, because the parties have agreed to this factual statement I am about to make.
>
> The parties stipulate that the knife, Exhibit 28, and the sheath, Exhibit 30, were provided to the defense investigator on October 26, 2009. The knife was subsequently provided to law enforcement. The parties stipulate that the knife and sheath are in the same condition today as they were on October 26, 2009. The parties further stipulate that the knife was sent to the Colorado Bureau of Investigation for testing and analysis.

¶ 25    Trujillo then testified that the defense's investigator retrieved "Jose's knife" and, again, that she'd never actually seen it. But Trujillo said that she was able to describe it to investigators because she "had a glance at it." The prosecutor asked whether she had ever touched the knife or wiped it down. She said she hadn't. Then, Trujillo testified that the knife admitted in evidence wasn't

15

the knife that the investigator had taken from the basement because "[t]he other one was smaller and looked nothing like that."

¶ 26 Lopez's counsel renewed the motion for a mistrial, arguing that Lopez couldn't get a fair trial at that point because Trujillo's testimony implicated Lopez's attorneys in obtaining "Jose's knife." The court denied the motion.

¶ 27 As noted, the jury found Lopez guilty as charged, and a division of this court affirmed the judgment of conviction.

### C. Postconviction Proceedings

¶ 28 At the evidentiary hearing on Lopez's Rule 35(c) motion, Steinberg testified that he had met with Lopez (though he couldn't recall how many times), had reviewed the discovery materials, and "did whatever [he] thought was necessary to provide a defense."[3] He said that Lopez had told him he killed the victim using a kitchen knife taken from the victim's home (which Steinberg believed to be the knife the police had recovered) and then had sexual intercourse with the victim's body. Steinberg said that he learned at some point

---

[3] Toray didn't testify because he died in 2014, and Scherck didn't testify because, as an investigator indicated, no one was able to serve him with a subpoena.

that someone had put "Jose's knife" in his firm's safe, but — based on Lopez's admission — he didn't have any reason to believe that "Jose's knife" was the murder weapon. He also testified that the only person with access to the safe was the firm's office manager. He said he felt "zero" ethical conflict by representing Lopez. But he conceded that the knife should never have been obtained by anyone associated with the firm.

¶ 29    Deters testified that he didn't recall how "Jose's knife" had come into the firm's possession but believed that Scherck had worked on the case. Deters said one concern he had regarding the knife was that one or more attorneys with the firm might have to testify about the knife's chain of custody without a stipulation to the knife's admission. But he also said that he didn't sense or feel a conflict "so pointed and so identifiable and direct" that it required the firm to withdraw from representing Lopez.

¶ 30    Glassman testified that after the court appointed him to advise it and Lopez as to any possible conflict,[4] he researched and analyzed the legal issues and spoke with Steinberg, Deters, Toray,

_____

[4] Glassman made clear that he represented Lopez, and so his duties as an attorney were to Lopez.

17

the prosecutors, and Lopez. He was unable to reach Adam Tucker and didn't talk to Scherck. He believed that, after discussing the matter with prosecutors, only a potential, not actual, conflict existed. Glassman thought there had been an assertion that the knife had been "wiped" and that it could be inferred that it had been wiped by someone at the firm given the length of time the knife had been in the firm's possession.[5] He understood the purpose of the stipulation was to avoid eliciting facts that could create that inference. And one of the prosecutors had said the district attorney's office wasn't intending to prosecute charges or file ethics complaints against any of the firm's attorneys or Scherck.

¶ 31 In discussing the matter with Lopez, Glassman told him the following:

- Even with the stipulation, a potential conflict existed. This was so because if Lopez had obtained different counsel, that attorney could try to "place the blame for the collection of the knife, and the fact that it was withheld from the [p]rosecution on his former counsel."

---

[5] Glassman also recognized a potential inference that Lopez's girlfriend had wiped the knife.

18

- If new counsel did so, that might take the blame off Lopez, given that he was in custody when Scherck retrieved the knife, and shift the blame to the firm, his girlfriend, or his mother.

- If Lopez wanted new counsel, he qualified for a public defender.

- Blaming the chain of custody problem on Scherck was an option if he obtained new counsel. They also discussed whether doing so would benefit Lopez.

¶ 32 Despite being so advised, Lopez told Glassman that he didn't want a new attorney, even after Glassman had discussed with him "all the reasonable scenarios in terms of how it could play up to his benefit if he got a different attorney." And Glassman opined that Lopez's decision appeared to be knowing and voluntary.

¶ 33 The postconviction court expressly found Steinberg's testimony "far more credible" than Lopez's and found Glassman's

testimony credible. The court expressly found Lopez's testimony at the hearing self-serving and not credible.[6]

¶ 34 The postconviction court rejected Lopez's conflict-based ineffective assistance of counsel claim — insofar as the trial court proceedings were concerned — because he had validly waived his right to conflict-free counsel after being sufficiently advised by both Glassman and the court.[7]

### D. Standards of Review and Applicable Law

¶ 35 Whether an attorney had a conflict of interest is a question of law that we review de novo. *Lopez*, ¶ 29 (citing *Ronquillo v. People*, 2017 CO 99, ¶ 13). In doing so, we defer to the postconviction court's findings of historical fact unless they are clearly erroneous. *People v. Hagos*, 250 P.3d 596, 613 (Colo. App. 2009).

---

[6] The postconviction court also heard testimony from Lopez's mother and father, Trujillo, Tucker, Savanna Rice (the investigator who tried to serve Scherck with a subpoena), Warren Miller (lead detective investigating the victim's death), John Hower (former deputy district attorney), Jason Siers (chief deputy district attorney), and Ann Roan (an expert witness in criminal defense and legal ethics).

[7] The court found that there was no actual conflict (only a potential conflict), but even if there was an actual conflict, Lopez had waived it.

¶ 36    "In all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e."  U.S. Const. amend. VI; *see also* Colo. Const. art. II, § 16.  This protection includes the right to conflict-free counsel.  *West v. People*, 2015 CO 5, ¶ 15 (first citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); then *Wood v. Georgia*, 450 U.S. 261, 271 (1981); and then *People v. Martinez*, 869 P.2d 519, 524 (Colo. 1994)).

¶ 37    A conflict exists when either "(1) an attorney's representation of one client is directly adverse to another client," or "(2) when the attorney's ability to represent a client is materially limited by the attorney's responsibility to another client or to a third person, or by the attorney's own interests."  *People v. Edebohls*, 944 P.2d 552, 556 (Colo. App. 1996) (citing Colo. RPC 1.7(a)-(b)), *overruled on other grounds by Lopez*, 2024 CO 50, ¶ 3.  A conflict can be either potential, meaning it is possible or nascent and in all probability will arise, *People v. Harlan*, 54 P.3d 871, 878 (Colo. 2002), or actual, meaning it "adversely affects counsel's performance," *Mickens*, 535 U.S. at 172 n.5; *accord West*, ¶ 28.

¶ 38    But "a defendant can waive the right to conflict-free counsel so long as the waiver is voluntary, knowing, and intelligent."  *Dunlap v.*

21

*People*, 173 P.3d 1054, 1070 (Colo. 2007). For a defendant to waive conflict-free representation, "the lawyer must reasonably believe that he will be able to provide competent and diligent representation," and the defendant must be fully advised of all existing conflicts and give informed consent. *People v. Nozolino*, 2013 CO 19, ¶ 16 (citing Colo. RPC 1.7). A defendant's waiver is voluntary, knowing, and intelligent when (1) "the defendant was aware of the conflict and its likely effect on the defense attorney's ability to offer effective representation, and (2) . . . the defendant thereafter voluntarily, knowingly, and intelligently relinquished his right to conflict-free representation." *Martinez*, 869 P.2d at 525.

¶ 39    That said, some conflicts may not be waived; a court may compel disqualification and override a waiver after examining the following factors: "(1) the defendant's preference for particular counsel; (2) the public's interest in maintaining the integrity of the judicial process; and (3) the nature of the particular conflict." *Nozolino*, ¶ 16.

¶ 40    We review de novo whether a defendant voluntarily, knowingly, and intelligently waived his right to conflict-free representation. *United States v. Brown*, 202 F.3d 691, 697 (4th Cir. 2000); *United*

22

*States v. Brekke*, 152 F.3d 1042, 1045 (8th Cir. 1998); *see also*
*People v. Lavadie*, 2021 CO 42, ¶ 22 (reviewing de novo whether a
defendant waived his right to counsel). And we will assume that we
also review de novo the question whether the conflict was waivable.
But we defer to the postconviction court's findings of fact relevant to
these issues. *Brekke*, 152 F.3d at 1045 ("We review for clear error a
district court's factual findings that underlie a determination of
whether a defendant waived his right to conflict-free counsel . . . .");
*see Lavadie*, ¶ 22 (in assessing whether a defendant validly waived
his right to counsel, we accept the court's findings of historical facts
if they are supported by competent evidence). And we won't
second-guess the postconviction court's credibility determinations.
*See People v. Tresco*, 2019 COA 61, ¶ 16.

### E. Analysis

¶ 41 Lopez asserts that, contrary to the trial court's and the
postconviction court's conclusions, the firm's attorneys labored
under an actual conflict of interest during plea negotiations and at
trial because the firm "generated incriminating physical evidence —
a potential murder weapon — against [its] own client for use by the
prosecution." But his argument that an actual conflict existed

23

instead focuses on the firm's alleged incentive to "curry favor with the prosecution at the potential expense of [its] client."  This incentive arose, he says, because the theory that "Jose's knife" had been wiped clean (or "mishandled") by someone at the firm was one that (1) wouldn't incriminate Lopez but (2) couldn't be argued by the firm's attorneys at trial because doing so would expose them or others with the firm to potential criminal and disciplinary consequences.

¶ 42    Lopez goes on to contend that this conflict wasn't waivable, and even if it were, he didn't knowingly and intelligently waive it because he wasn't sufficiently advised of the nature of the conflict. As for the conflict's possible effect on plea negotiations, Lopez argues that no one discussed this matter with him.  As for representation at trial, Lopez argues that Glassman wasn't aware of certain facts relating to the firm's retention of the knife and, accordingly, never told him those facts or fully explained how Scherck's actions in obtaining and retaining the knife gave the prosecution "the ability to insinuate that Lopez, his girlfriend, or a family member had wiped off the knife in an effort to destroy inculpatory evidence."

24

¶ 43    We conclude that the record supports the postconviction

court's conclusions that the firm's attorneys didn't provide

ineffective assistance in connection with plea negotiations and that

Lopez didn't suffer any prejudice by virtue of any possible ineffective

assistance because he was never willing to accept the plea offer

(described below) that he says his attorneys prematurely rejected.

It follows that Lopez can't show any adverse effect from the

purported conflict.

¶ 44    As for the firm's attorneys' representation of Lopez at trial, we

conclude that Lopez did and could waive any conflict.

### 1.    Plea Negotiations

¶ 45    The firm's attorneys tried to negotiate a plea agreement that

would call for a prison sentence of no more than forty-eight years,

based on Lopez telling the attorneys that forty-eight years was the

most prison time he would accept.  The prosecution, however,

offered sixty years.  One of the firm's attorneys — most likely

Steinberg — rejected that offer.  It is unclear whether that offer was

rejected before or after it was communicated to Lopez.  (Lopez

contends it was before.)  But the postconviction court found, based

on its credibility determinations, that the offer was conveyed to

Lopez and he rejected it, even though the attorneys recommended that he take it.  (Lopez doesn't appear to dispute this.)

¶ 46     Lopez argues, however, that the supposed conflict of interest affected the firm's incentives in the negotiations.  He appears to say that, because he believed the offer was contingent on the firm "cleaning up" the conflict issue (which it didn't want to do since it wasn't in the firm's best interests), the firm had an incentive to reject the offer.  But the postconviction court found, with record support, that the firm conveyed the offer to Lopez and recommended that he accept it but that Lopez refused to accept it because he insisted on going to trial.  Therefore, the premise of Lopez's argument — that the firm had an incentive to reject the offer without first conferring with him — is neither here nor there.  The firm's premature rejection of the offer would matter only if the firm never informed him of it, and he would have been willing to accept it.  The postconviction court's factual findings, which enjoy record support, foreclose any such conclusions.

¶ 47     In sum, Lopez didn't show any adverse effect in plea negotiations arising out of the purported conflict.  Thus, his contention that the firm's asserted conflict in the context of those

negotiations requires reversal necessarily fails.  *See Lopez*, ¶ 45

(Absent circumstances not alleged in this case, a defendant must

show "a conflict of interest actually affected the adequacy of his

representation."); *West*, ¶¶ 18, 57.

### 2.    Representation at Trial

¶ 48    We conclude that Lopez waived his right to conflict-free trial

counsel.

¶ 49    As discussed, before Lopez waived the conflict, he met with

Glassman, his court-appointed, independent, and conflict-free

attorney, who had researched the conflict and relevant law and had

spoken with attorneys on both sides of the case and others.  He

advised Lopez of the risks involved with continuing with the firm's

attorneys as his trial counsel.  He specifically advised Lopez that

the conflict meant the firm's attorneys couldn't (or wouldn't) argue

the possibility that someone at the firm had wiped or mishandled

"Jose's knife."  That is the same information Lopez claims on appeal

that he didn't have.  But the postconviction court found Glassman

credible on this point.

¶ 50    The trial court advised Lopez on the record about his right to

"100 percent" conflict-free counsel and about the effect the

stipulation might have on the jury. After Lopez said he didn't understand some of the terminology, the trial court ensured that he understood the concept of a conflict of interest by defining it and explaining that he had a right to conflict-free counsel. Lopez then said he wished to waive the conflict.

¶ 51    As noted, the court also told Lopez that if testimony implicating the timeline of the possession of the knife was elicited at trial in a way that prejudiced him, the court would declare a mistrial "that would undo the whole thing and we would have to start over." Lopez said he understood.

¶ 52    Based on these facts, we conclude that Lopez was adequately advised of the nature of the conflict and that he voluntarily, knowingly, and intelligently waived any conflict arising from the firm's collection and retention of the knife.[8]

¶ 53    Finally, we also reject Lopez's contention that he couldn't waive the conflict. Lopez's desire that the firm remain as his trial counsel was strong and clear. He considered the firm to be the best available, saying, "If anybody can do it, it's Harvey [Steinberg]." He

---

[8] Lopez doesn't appear to contest the voluntariness of his waiver.

even told his girlfriend that his mother "need[ed] to talk to Steinberg" because he was the "best attorney"; "he gets everybody off for the death penalty; he gets everybody off for life." He reiterated his strong desire to keep his same lawyers during his discussions with Glassman and the court.

¶ 54     We don't perceive how the public's interest in the integrity of the judicial process is diminished in this case because Lopez was adequately advised of the nature of the conflict and then waived his right to conflict-free counsel; the prosecution didn't intend to file charges or ethics complaints against Lopez's attorneys or the firm's investigator; and the stipulation prevented the jury from learning the extent of the firm's handling of the knife.

¶ 55     Finally, the nature of the conflict was only potential when combined with the stipulation, so the extreme remedy of disqualifying counsel in the face of Lopez's waiver wouldn't have been appropriate. *See Nozolino*, ¶ 24.

### III.   Burden of Proof Analogy

¶ 56     Lopez contends on direct appeal that the trial court impermissibly lowered the prosecution's burden of proof by

analogizing the beyond a reasonable doubt standard to baking a cake.  We disagree.

## A.    Additional Facts

¶ 57    At a pretrial hearing with Lopez present, the trial court told both sides that it usually used an analogy of baking a cake to illustrate the presumption of innocence, the reasonable doubt standard, and the burden of proof elements.  Lopez's counsel didn't object to the court's use of the analogy at the hearing.

¶ 58    During voir dire, the trial court used the cake-baking analogy to explain legal principles in everyday terms.  The court acknowledged that baking a cake didn't have the same gravity as considering Lopez's guilt, and it cautioned the prospective jurors, "[P]lease do not think that I am in any way minimizing the allegations in this case by equating the elements of the offense to the ingredients in baking a cake."

¶ 59    The court explained that "the burden of proof is upon the prosecution to prove to the satisfaction of the jury, beyond a reasonable doubt, the existence of all the elements necessary to constitute the crime charged. . . .  The defense doesn't have to bring any ingredients.  The defense doesn't have to help."  It compared

30

the elements of the offense to ingredients of the cake: "[E]lements are what would have to be proven beyond a reasonable doubt. . . . You may still have questions at the end of this case. . . . You may eat a piece [of cake] and say, 'I wonder if this is Betty Crocker or Duncan Hines?' Doesn't matter as long as it's a cake." It explained that the prosecution would "have to prove those things that make up the charge, just like they'd have to prove beyond a reasonable doubt that they have an egg or whatever."

¶ 60 Before explaining reasonable doubt by analogy, the court read the term's definition from the model instructions then in effect:

> Reasonable doubt means a doubt based upon reason and common sense [that] arises from a fair and rational consideration of all of the evidence, or lack of evidence, in the case. It is a doubt [that] is not vague, speculative or imaginary doubt, but such doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

COLJI-Crim. E:03 (2008).

¶ 61 The court again cautioned the prospective jurors, "I don't want you to think in any way I'm quantifying what reasonable doubt is. I'm not trying to say it's 80% or 90% or 10%." It then explained,

> Using my cake recipe, when it calls for a cup of water, how many of you go down and get the

> chemistry set and get it right to there? And
> you've got to the micro millimeter of what a
> cup is? What do we do? We take the cup,
> eyeball it, make sure that a little thing is
> toward the top of the little line and we kind of
> eyeball it. What we're doing is we're proving to
> our self beyond a reasonable doubt that I've
> got the right amount of water. You're not
> exact. It's not proof beyond all doubt.

Finally, it reiterated its caution, "I'm not trying to quantify in any way reasonable doubt; I'm just saying that is the thought process."

¶ 62 Defense counsel didn't object to these remarks.

### B. Standard of Review and Applicable Law

¶ 63 "We review de novo the question of whether a trial court accurately instructed the jury on the law. Instructions that lower the prosecution's burden of proof below the reasonable doubt standard constitute structural error and require automatic reversal." *Tibbels v. People*, 2022 CO 1, ¶ 22 (citation omitted).

¶ 64 We use a functional test to determine whether a trial court's statements to the jury lowered the prosecution's burden of proof; we assess "whether there is a reasonable likelihood that the jury understood the court's statements, in the context of the instructions as a whole and the trial record, to allow a conviction

based on a standard lower than beyond a reasonable doubt." *Id.* at ¶ 43; *see also Pettigrew v. People*, 2022 CO 2, ¶ 36.

¶ 65   Both parties agree that this issue wasn't preserved, so we review for plain error. *See People v. Rediger*, 2018 CO 32, ¶ 40. Plain error is error that is obvious and substantial. An error is substantial if it so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

### C.   Analysis

¶ 66   In *Tibbels*, the trial court likened reasonable doubt to the concern that a prospective homebuyer might have upon observing a structurally significant, floor-to-ceiling crack in the foundation of a home the homebuyer desperately wanted to buy. *Tibbels*, ¶¶ 10-13. The supreme court concluded that the analogy effectively lowered the prosecution's burden of proof and undermined Tibbels' constitutional right to the presumption of innocence. *Id.* at ¶ 49. The trial court ensured that the jury would give the analogy undue weight, particularly because

> (1) the court gave the example immediately
> after undermining the pattern instruction on
> reasonable doubt; (2) the court came back to

> its illustration later in voir dire, expressly equating reasonable doubt with "that example that I gave you"; and (3) . . . the court never instructed the jury to disregard its example.

*Id.* at ¶ 50. Additionally, the crack-in-the-foundation analogy overstated the degree of doubt and uncertainty required for acquittal by suggesting that "a reasonable doubt was one that was so obvious that it would give every reasonable person pause and cause them to hesitate to act." *Id.* at ¶ 51.

¶ 67    In *Pettigrew*, a companion case to *Tibbels*, the trial court used a birth date analogy to explain reasonable doubt. *Pettigrew*, ¶¶ 14-17. The trial court (1) clarified the distinction between a not guilty verdict and innocence; (2) criticized the pattern definition of reasonable doubt; (3) provided its own example to illustrate the concept of reasonable doubt by way of a dialogue with a prospective juror regarding the reliability of the juror's birth date; and (4) in response to a prospective juror's question about why certain charges hadn't been brought against the defendant, commented, "[W]e try people when there's evidence to support the charges, okay?" *Id.* The supreme court concluded that the trial court's statements undermined the pattern instruction, made it more likely

that the jury would rely on the "confusing at best" birth date analogy, and "raised the prospect" that jurors might believe that Pettigrew had an obligation to create reasonable doubt. *Id.* at ¶ 41. But despite these concerns, the supreme court didn't reverse:

> [W]e perceive no risk that the prospective jurors would have interpreted the court's statement as placing any burden on Pettigrew. This is particularly true here, given that (1) in its comments regarding the distinction between "innocent" and "not guilty," the court had made clear that the prosecution had the burden of convincing the jurors beyond a reasonable doubt of Pettigrew's guilt; (2) after the jury was empaneled, the court thoroughly explained the reasonable doubt standard and the presumption of innocence in correct and clear terms; and (3) in its final instructions, the court correctly advised the jury on the concepts of the prosecution's burden of proof, the presumption of innocence, and reasonable doubt. And given the clarity and succinctness of the court's repeated statements that the prosecution bore the burden of proving Pettigrew's guilt beyond a reasonable doubt, in contrast to its confusing birthday example, we cannot conclude that there is a reasonable likelihood that the jury understood the court's statements to have lowered the prosecution's burden of proof.

*Id.* at ¶ 42. And the supreme court noted that the trial court mitigated the potential impact of its fourth statement — that "we try people when there's evidence to support the charges" — by

reaffirming Pettigrew's presumed innocence. *Id.* at ¶¶ 43, 45. The supreme court concluded that, despite problematic comments during voir dire, there wasn't a reasonable likelihood that the statements lowered the prosecution's burden of proof below the reasonable doubt standard. *Id.* at ¶ 2.

¶ 68 Viewing the trial court's comments in the context of the record as a whole, and considering the nature, scope, and timing of the analogy, we conclude that the court didn't err by analogizing the prosecution's burden of proof and reasonable doubt to baking a cake. The court prefaced its analogy by indicating that it wasn't "minimizing the allegations in this case by equating the elements of the offense to the ingredients of baking a cake." It explained the cake analogy as a way to understand the various standards, but it also read the prospective jurors the correct definition of reasonable doubt. The court cautioned that it wasn't trying to quantify what reasonable doubt should be. The court was unequivocal in its explanation that Lopez and his counsel had no burden and accurately described the prosecution's burden to prove every element of the offense.

36

¶ 69 And the court didn't reduce the prosecution's burden by comparing it to "eyeballing" the cake ingredients. We aren't persuaded to reach a contrary conclusion by the cases Lopez cites to support this argument. In *United States v. Cox,* 536 F.3d 723, 729 (7th Cir. 2008) (citation omitted); *United States v. Johnson,* 185 F.3d 765, 768 (7th Cir. 1999) (citation omitted); and *United States v. Duarte,* 950 F.2d 1255, 1265-66 (7th Cir. 1991), the courts held that determining drug quantity or value for sentencing purposes can't be based on "nebulous eyeballing." We don't see how those cases apply to this one.

## IV.    Disposition

¶ 70 The judgment of conviction and the postconviction court's Crim. P. 35(c) order (to the extent it denied Lopez's demand for a new trial) are affirmed.

JUDGE YUN concurs.

JUDGE TAUBMAN specially concurs.

JUDGE TAUBMAN, specially concurring.

¶ 71     I agree with the majority that defendant, Daniel Jesus Lopez, waived his right to assert a conflict of interest concerning his continued representation by several attorneys at the law firm of Springer and Steinberg.  However, I write separately because I believe Lopez's continued representation by those lawyers raises three significant possible violations of Colorado's ethical rules.

¶ 72     First, the retrieval of "Jose's knife" by the law firm's investigator and storage of it for more than three years in the law firm's safe raises serious concerns because the prosecution considered it to be a possible murder weapon.  Second, the obligation of attorneys to supervise their employees raises questions regarding the adequacy of the lawyers' supervision of the investigator.  Third, the stipulation between Lopez's attorneys and the prosecutors did not eliminate the actual or potential conflict of interest between Lopez and the law firm.

¶ 73     Although the majority opinion does not address these ethical issues, I believe it is appropriate to highlight them because they are central to Lopez's arguments concerning the ineffectiveness of his trial counsel.

## I.    Background

¶ 74    While the majority opinion details the circumstances concerning Lopez's convictions for first degree murder after deliberation, first degree felony murder, and first degree burglary, I summarize here the relevant facts regarding the above ethical issues.

¶ 75    The record of the consolidated cases shows that six attorneys from Springer and Steinberg were involved or may have been involved in representing Lopez.  One was Harvey Steinberg, the firm's managing principal.  Lopez's trial attorneys were Richard Toray, who died in 2014, and Daniel Deters.  A fourth attorney, Adam Tucker, testified at the Crim. P. 35(c) postconviction hearing that he had left the law firm before it began representing Lopez, and Steinberg confirmed this in his testimony at the postconviction hearing.  Nevertheless, the trial court referred to "Adam Tuck," apparently the same lawyer, as the one who directed the investigator to obtain Jose's knife.

¶ 76    Another lawyer, Geanne Moray, appears to have had little to no involvement in the conduct that raises ethical issues.  However, Michael Zweibel, who represented Lopez on appeal, was involved in

the postconviction court's conclusion that Springer and Steinberg had an actual conflict of interest in Lopez's direct appeal.

¶ 77     In addition, the firm's investigator, Karl Scherck, obtained Jose's knife from Lopez's girlfriend, Jennifer Trujillo, or from Lopez's stepfather. Also, attorney Jesse Glassman was appointed by the trial court to investigate whether the firm had an actual or potential conflict of interest based on Scherck retrieving Jose's knife from Trujillo or Lopez's stepfather. At a pretrial hearing, Glassman testified that the law firm's attorneys did not have an actual conflict but had, at most, a potential conflict of interest.

¶ 78     At the conclusion of the hearing, during which both Steinberg and Glassman testified, the trial court agreed with Glassman and credited Steinberg's testimony that he was not aware that the knife had been kept in his firm's safe for over three years. The trial court also concluded that any possible conflict had been satisfactorily addressed by the parties' stipulation that defense counsel had obtained Jose's knife, that it remained in the same condition as when they received it, and that defense counsel had turned the knife over to the prosecution.

¶ 79     That stipulation was intended to eliminate any possible concern that anyone at the law firm had wiped the knife clean to remove any possible inculpatory evidence and to resolve any chain of custody issues.

¶ 80     The trial court also concluded, as noted in the majority opinion, that Lopez voluntarily, knowingly, and intelligently waived any possible conflict of interest and desired to have the law firm's attorneys continue to represent him.

## II.    Lawyer's Duty to Turn Over Potentially Incriminating Evidence

### A.    Applicable Ethics Rules

¶ 81     Rule 3.4(a) of the Colorado Rules of Professional Conduct provides that a lawyer shall not "unlawfully obstruct another party's access to evidence or unlawfully . . . conceal a document or other material having potential evidentiary value."

¶ 82     Comment 2 of that rule states, in relevant part:

> Documents and other items of evidence are often essential to establish a claim or defense. Subject to evidentiary privileges, the right of an opposing party, including the government, to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is . . . concealed . . . .

Colo. RPC 3.4(a) cmt. a.

¶ 83    Formal Opinion 60 of the Colorado Bar Association's Ethics Committee, entitled "Duty With Respect to Client's Incriminating Evidence,"[1] addresses this issue, stating that lawyers have "an affirmative duty to surrender incriminating physical evidence in their possession."  Colo. Bar Ass'n Ethics Comm., Formal Op. 60, at 1 (2025).  It states that defense lawyers "and their agents cannot suppress or conceal incriminating physical evidence in the lawyer's possession."  *Id.*

¶ 84    Two of the hypothetical situations addressed in Formal Opinion 60 are relevant here.

---

[1] The original Opinion 60 was adopted on July 24, 1982, when the Code of Professional Responsibility was in effect.  *See* Continuing Legal Educ. in Colo., Inc., *Colorado Ethics Handbook* (6th ed. Supp. 2018).  Both Glassman and Ann Roan, Lopez's criminal ethics expert at the Crim. P. 35(c) hearing, testified based on their review of the original rule, even though the Rules of Professional Conduct replaced the Code on January 1, 1993.  The revised Opinion 60 states that the committee believed that the conclusions in the original opinion were correct but revised the opinion "to provide guidance as to the relevant provisions of the Rules of Professional Conduct."  Colo. Bar Ass'n Ethics Comm., Formal Op. 60, at 2 (2025).  I cite to the revised opinion here for ease of reference.  I note that the two hypotheticals I cite are found in both the original and the revised opinion.

¶ 85    The first hypothetical concerns a client charged with murder who shows the lawyer the gun used in the crime and asks the lawyer to take possession of it. *Id.* at 9. It concludes that "[i]f the lawyer takes possession of the gun, Rule 3.4(a) requires the lawyer to turn the gun over to the police or prosecuting authority because retaining the gun would violate applicable law." Formal Op. 60, at 9; *see* §§ 18-8-610, 18-8-105(2), C.R.S. 2024.

¶ 86    The second hypothetical is most analogous to the circumstances here. Under this fact pattern, the spouse of a client charged with murder brings a gun to the lawyer's office and tells the lawyer that the defendant told the spouse to ask the lawyer to hold the gun for the client. Formal Op. 60, at 9-10. Relying on Rule 3.4(a), the revised opinion reiterates that a lawyer may not conceal material evidence having evidentiary value. *Id.* at 10. It adds, "The lawyer must take steps to ensure the gun is turned over to the police or prosecution." *Id.* Also, revised Opinion 60 states that the lawyer may be compelled to testify about the source of the gun, assuming the lawyer has no attorney-client relationship with the spouse. *Id.* Finally, the opinion states that the lawyer must advise

the defendant that the lawyer may not conceal material evidence and the gun must be turned over. *Id.*

## B.    Analysis

¶ 87    At the pretrial hearing, Glassman testified that he had spoken with Steinberg, Toray, and Peters, all of whom denied knowing that Jose's knife had been kept in the law firm's safe from October 2009 until January 2013. These three attorneys testified that Jose's knife was turned over to the prosecution as soon as they learned that it had been stored in the firm's safe.

¶ 88    Glassman was unable to interview Scherck, who successfully sought to avoid service of a subpoena on him and vowed that he would not provide information. Glassman also did not interview Tucker, whom he referred to as "Tuck," but said he had been told that "Tuck" had directed Scherck to obtain Jose's knife. The trial court credited this testimony and found that Tucker had directed Scherck to obtain Jose's knife. The trial court ruled that even though this action was improper, it was excusable because of Tucker's lack of experience.

¶ 89    Notably, at the postconviction hearing, Tucker testified that he had not worked on Lopez's case and had left the law firm before it began representing Lopez. Steinberg agreed with this timeline.

¶ 90    The key takeaway of the testimony at both the pretrial hearing and the postconviction hearing was that neither the trial court nor the postconviction court determined whether an attorney had directed Scherck to retrieve Jose's knife or whether Scherck had made the decision independently. As noted, Steinberg, Toray, and Deters said that they did not direct Scherck to retrieve Jose's knife. Although the trial court found that Tucker had directed Scherck to do so, Tucker testified under oath that he never worked on Lopez's case, testimony that Steinberg corroborated.

¶ 91    Another related issue is when Steinberg learned that Jose's knife was being stored in the firm's safe. At the postconviction hearing, John Hower, the initial lead prosecutor, testified that he spoke with Steinberg about a year before Jose's knife was turned over to the prosecution. Although he could not recall whether Steinberg was aware of the knife, Hower's call should have put Steinberg on notice that Lopez had asked Trujillo to dispose of Jose's knife. That inquiry might be significant because Steinberg

testified at the postconviction hearing that no ethical issue existed concerning the knife because Lopez had not given it to him or anyone at the firm. However, the second hypothetical in Opinion 60 discussed above would have applied to Trujillo or Lopez's stepfather giving Jose's knife to Scherck. *See id.* at 9-10. Thus, Steinberg and Scherck should have known that Scherck could not ethically retrieve the knife and bring it to the firm, unless it was to be immediately turned over to the prosecution.

¶ 92 In addition, Hower's call to Steinberg should also have put Steinberg on notice that the prosecution believed Jose's knife might have been the murder weapon. Thus, even if Steinberg did not believe Jose's knife was the murder weapon, he still had an ethical obligation to turn it over to the prosecution. *See* Colo. RPC 3.4(a).

¶ 93 Accordingly, despite the clear ethical proscription in Colo. RPC 3.4(a) and Opinion 60 against a lawyer retaining possible inculpatory evidence, the Springer and Steinberg firm kept Jose's knife in its possession for more than three years. This raises questions about how the firm could have held onto Jose's knife for over three years without its trial lawyers being aware of it. Although Steinberg conceded that neither he nor anyone in the firm

should have obtained the knife, the circumstances under which Jose's knife came to be placed in the law firm's safe remain unclear. Perhaps further investigation of this issue is warranted.

### III. Lawyer's Duty to Supervise Investigators

¶ 94     The possibility that Lopez's attorneys did not adequately supervise Scherck or that Scherck obtained Jose's knife unbeknownst to Lopez's attorneys raises a second ethical issue.

### A. Applicable Ethics Rules

¶ 95     Colo. RPC 5.1 and 5.3 govern the responsibilities of a partner or supervisory lawyer and the responsibilities regarding nonlawyer assistance.

¶ 96     Rule 5.1(a) and (b) require a partner or a lawyer with supervisory authority to make reasonable efforts to ensure that all lawyers in a law firm conform to the Rules of Professional Conduct. Such lawyer will be responsible for another firm lawyer's violation of the ethical rules if the first lawyer ratifies the second lawyer's violation of the rules or knows of improper conduct but fails to take reasonable remedial action. Colo. RPC 5.1(c).

¶ 97     Further, a partner or lawyer with supervisory authority must ensure that nonlawyers employed by or retained by the firm engage

in conduct compatible with the rules of professional conduct. Colo. RPC 5.3(a). A partner or supervisory lawyer shall be responsible for a nonlawyer's improper conduct if the partner or lawyer orders or ratifies such conduct, Colo. RPC 5.3(c)(1), or fails to take reasonable remedial action, Colo. RPC 5.3(c)(2).

¶ 98 Two comments to Rule 5.3 detail the responsibilities of a partner or supervising lawyer in this context. Comment 2 specifies that Rule 5.3 applies to investigators, stating in part, "A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment . . . ." Additionally, comment 3 provides that when retaining or directing a nonlawyer who is not a firm employee, the lawyer should instruct the nonlawyer regarding the applicable ethical rules to ensure that the nonlawyer follows them. Colo. RPC 5.3 cmt. 3.

## B. Analysis

¶ 99 The record indicates that Scherck was hired as an investigator to work on this case. As a former police officer, he had worked for the law firm previously. Steinberg testified that he was not aware of any instruction given to Scherck regarding the rules of professional conduct, including Rule 3.4 or Opinion 60.

¶ 100    As discussed above, the record does not indicate whether any lawyer directed Scherck to retrieve Jose's knife and store it in the law firm's safe. This leaves us with two possible scenarios, both of which implicate Rule 5.3.

¶ 101    First, if any lawyer directed Scherck to retrieve and store Jose's knife, that lawyer and any lawyer supervising that lawyer would be responsible for Scherck's conduct under Rules 5.1 and 5.3.

¶ 102    In the alternative, Scherck may have acted independently in retrieving the knife and storing it in the law firm's safe. Whether this conduct violated the rules of professional conduct would depend in part on whether any lawyer had instructed Scherck regarding the applicable rules, specifically, Rule 3.4. If one or more lawyers had instructed Scherck, or if it was shown that he had been previously instructed about the rules of professional conduct, then those lawyers would have acted properly. However, if Scherck had not been instructed about Rule 3.4 and Opinion 60, one or more lawyers could be responsible for Scherck's conduct.

¶ 103    A related issue that the record does not address is whether the law firm's office manager knew that Jose's knife had been stored in

the safe and, if so, whether she informed any of the lawyers about it. Sternberg testified that the office manager was responsible for storing materials in the safe. However, the record does not indicate whether she knew that a knife was being stored in the safe or, if so, where it came from. In any event, it is not clear whether Steinberg ever monitored the contents of the safe.

## IV. Conflict of Interest

¶ 104 Although the majority correctly concludes, in my view, that Lopez waived any conflict of interest with his attorneys, I agree with the postconviction court that Springer and Steinberg, as appellate counsel, had an actual conflict of interest. As discussed below, I believe that a conflict of interest also existed during Lopez's trial.

## A. Applicable Ethics Rules

¶ 105 Colo. RPC 1.7(a)(2) precludes an attorney from representing a client when a significant risk exists that representation of the client will be materially limited by the attorney's personal interest. However, Rule 1.7(b)(1) and (2) nevertheless provide that a lawyer with such a concurrent conflict of interest may represent a client if (1) the lawyer reasonably believes the lawyer can provide competent

and diligent representation to the client, and (2) the representation is not prohibited by law.

¶ 106   As the majority points out, a conflict can be actual or potential.  It is actual when it "adversely affects counsel's performance."  *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  A conflict is potential when it is possible or nascent and is one that, in all probability, will arise.  *People v. Harlan*, 54 P.3d 871, 878 (Colo. 2002).  An actual conflict may exist even if no criminal charges are filed or no disciplinary complaint is submitted to disciplinary authorities.  *People v. Curren*, 228 P.3d 253, 259 (Colo. App. 2009).  It is enough that such charges could be filed or ethical misconduct proceedings could be brought against an attorney.  *Id.*

## B.   Analysis

¶ 107   The postconviction court determined that Lopez's trial lawyers did not have an actual conflict of interest when they continued to represent Lopez after turning over Jose's knife to the prosecution and entering the stipulation stating that the knife was in the same condition as when it was first received by Scherck.

¶ 108   The postconviction court concluded that Lopez did not show that his trial attorneys' conduct adversely affected their

51

performance. *See People v. Edebohls*, 944 P.2d 552, 556 (Colo. App. 1996), *overruled on other grounds by People v. Lopez*, 2024 CO 50, ¶ 3, 553 P.3d 203, 205. However, the postconviction court ruled that, although Lopez validly waived a conflict of interest regarding his trial, he did not waive and was not even advised of the attorneys' continuing conflict of interest during his direct appeal. Thus, the postconviction court concluded, Springer and Steinberg's "potential conflict of interest during the trial grew into an actual conflict of interest on appeal affecting their representation." In concluding that Lopez had waived any conflict of interest at the trial, the majority does not address (because it does not need to) the postconviction court's conclusion that the law firm's attorneys had an actual conflict of interest in pursuing Lopez's direct appeal.

¶ 109 The postconviction court identified three bases for an actual conflict of interest. First, it concluded that Lopez's appellate counsel did not argue in his direct appeal that the alleged conflict of interest concerning the retrieval of Jose's knife was not waivable, and, if it was, Lopez did not validly waive the conflict. Second, the postconviction court determined that a reasonable argument could have been made in the direct appeal that Lopez had not been fully

52

advised of the conflict and did not understand the consequences of waiving it. Third, the postconviction court found that appellate counsel's "strategy of arguing that the conflict was either unwaivable or not validly waived was inherently in conflict with Springer and Steinberg's loyalty to preserving their ethical reputation."

¶ 110 The postconviction court found that these instances of actual conflict of interest adversely affected the performance of Lopez's attorneys in his direct appeal.

¶ 111 Lopez makes essentially the same contentions of actual conflict of interest in connection with his trial counsel. However, as I indicated above, I agree with the majority that Lopez waived any such conflict of interest.

¶ 112 In my view, the existence of an actual or potential conflict of interest was not removed by the prosecutors telling Lopez's lawyers that they did not intend to pursue criminal charges or ethical proceedings against them. Even if we assume that such statements were made in good faith, as we must, nothing precluded the prosecutors from changing their minds if they discovered additional information or learned that Lopez's attorneys had been aware that

Jose's knife had been stored in the law firm's safe. *See Curren*, 228 P.3d at 259.

¶ 113 Nevertheless, Lopez's assertions of a conflict of interest by both his trial and appellate attorneys raise serious ethical issues that warrant further consideration. Although Lopez's trial attorneys believed that their stipulation regarding the chain of custody issues concerning Jose's knife resolved any possible ethical issues, that stipulation still allowed the prosecution to argue, as it did, that Lopez, his girlfriend, or someone in his family had wiped Jose's knife clean. Thus, the stipulation ensured that the law firm's attorneys could not be blamed for possibly wiping Jose's knife clean but left open the possibility that Lopez or one of his family members had done so. Accordingly, the stipulation benefited the law firm, but not necessarily Lopez. It is therefore not clear that this conduct was consistent with Rule 1.7(b)(1) and (2).

## V.   Conclusion

¶ 114 Although I agree with the majority's conclusion that Lopez validly waived any conflict of interest in the trial court, the law firm's conduct at trial and in the direct appeal warrants further scrutiny regarding whether it was consistent with the Colorado

54

Rules of Professional Conduct regarding (1) the duty to turn over Jose's knife to the prosecution; (2) the extent of supervision of Scherck, the firm's investigator; and (3) any possible conflict of interest regarding the retrieval and retention of Jose's knife and the law firm's continued representation of Lopez.